Filed 9/18/18; Certified for Publication 10/17/18 (order attached)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MONTEREY COASTKEEPER et al., | C080530 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2012-80001324-CU-WM-GDS) |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD, | |
| Defendant and Appellant; | |
| GROWER-SHIPPER ASSOCIATION OF CALIFORNIA et al., | |
| Interveners and Appellants. | |

The Central Coast Region is one of the great agricultural regions of California. Unfortunately, waste discharges from irrigated agricultural operations, particularly from the use of fertilizers and pesticides, have impaired the quality of both surface water and groundwater in the region. The State Water Resources Control Board (State Board) and nine regional boards are responsible for regulating waste discharges to protect water quality. (Wat. Code, § 13263.)[1] Discharge requirements may be waived "if the state board or a regional board determines . . . that the waiver is consistent with any applicable state or regional water quality control plan and is in the public interest." (§ 13269, subd. (a).)

This case involves a challenge to a section 13269 waiver of waste discharge requirements for irrigated agricultural land.

In 2012, the Central Coast Regional Water Quality Control Board (Regional Board) issued a waiver of discharge requirements for irrigated agricultural operations in the region. We refer to this as the 2012 waiver. After review, the State Board modified the waiver. We refer to the State Board's modification as the modified waiver, which is the document at issue here.

Monterey Coastkeeper,[2] San Luis Obispo Coastkeeper, California Sportfishing Protection Alliance, and Santa Barbara Channelkeeper (collectively Coastkeeper) petitioned for a writ of mandate, challenging the modified waiver. They contended it did not meet the requirements of the Water Code and applicable state water policies. The trial court agreed in part, and issued a peremptory writ of mandate directing the State Board to set aside the modified waiver and issue a new waiver consistent with its decision.

---

[1] Further undesignated statutory references are to the Water Code.

[2] An entity self-described as "a program of The Otter Project, a non-profit organization."

The State Board and various agricultural interests as interveners appeal.  They contend generally that the trial court erred in comparing the modified waiver (unfavorably) to a 2010 *draft* of the 2012 waiver, failing to defer to the State Board's expertise and apply a presumption of correctness, and ignoring the appropriate reasonableness standard.  They raise specific objections to several of the trial court's findings.

As we explain, we agree with appellants as to two of their points; the trial court's findings as to the inadequacy of the tiering and monitoring provisions of the modified waiver are not supported by substantial evidence.  We modify the judgment accordingly and otherwise affirm.

## LEGAL BACKGROUND

*The Porter-Cologne-Act*

The Porter-Cologne Water Quality Control Act (Porter-Cologne Act) (§§ 13000 et seq.) governs water quality regulation in California.  It establishes the policy that "activities and factors which may affect the quality of the waters of the state shall be regulated to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible."  (§ 13000.)

The State Board and regional boards are charged with "primary responsibility for the coordination and control of water quality."  (§ 13001.)  The State Board formulates and adopts state policy for water quality control.  (§ 13140.)  The regional boards "formulate and adopt water quality control plans for all areas within the region." (§ 13240.)  The regional boards' water quality plans, called basin plans, must address the beneficial uses to be protected as well as water quality objectives, and they must establish a program of implementation.  (§ 13050, subd. (j).)  Water quality objectives are the limits or levels of constituents or characteristics allowed to protect the quality of the water.  (§ 13050, subd. (h).)

*Basin Plans*

Basin plans cover both point source and nonpoint source pollution. Point source discharge is discharge from a discrete conveyance, such as a pipe, ditch, canal, tunnel, or conduit, while discharge that is not from a point source, such as agricultural runoff, is nonpoint source (NPS) pollution. (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1403.) Here, we are concerned with NPS pollution.

The Central Coast basin plan "encompasses all of Santa Cruz, San Benito, Monterey, San Luis Obispo, and Santa Barbara Counties as well as the southern one-third of Santa Clara County, and small portions of San Mateo, Kern, and Ventura Counties. Included in the region are urban areas such as the Monterey Peninsula and the Santa Barbara coastal plain; prime agricultural lands [such] as the Salinas, Santa Maria, and Lompoc Valleys; National Forest lands, extremely wet areas like the Santa Cruz mountains; and arid areas like the Carrizo Plain."

The basin plan has three components: (1) identification of the beneficial uses to be protected; (2) water quality objectives to protect those uses; and (3) an implementation program to accomplish those objectives. The basin plan identifies numerous beneficial uses of water, including municipal and domestic water supply, protection of recreation and aquatic life, and agricultural supply.

The water quality objectives relevant here are for toxicity, pesticides, and nitrates.

*Toxicity*: "All waters shall be maintained free of toxic substances in concentrations which are toxic to, or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."

*Pesticides*: "No individual pesticide or combination of pesticides shall reach concentrations that adversely affect beneficial uses. There shall be no increase in pesticide concentrations found in bottom sediments or aquatic life."

*Nitrates*: For municipal water: 45 mg/L (milligrams per liter). (By comparison, it is 100 mg/L for agricultural use.)

4

The implementation component relies on waste discharge requirements and waivers and enforcement actions. The basin plan recognizes that the Porter-Cologne Act constrains regional boards from specifying the manner of compliance, and calls for encouraging implementation of best management practices.

*The NPS Policy*

Basin plans must be consistent with "state policy for water quality control." (§ 13240.) Two such policies are relevant here. The first is the Policy for Implementation and Enforcement of Nonpoint Source Pollution Control Program (the NPS Policy). The NPS Policy was adopted in 2004 to fulfill the requirements of Section 13369. Section 13369 requires the State Board, in consultation with other agencies, to prepare a detailed program for implementing the state's NPS management plan. The NPS Policy reflects that the discharge of waste into the waters of the state is a privilege not a right. (§ 13263, subd. (g).)

Under the NPS Policy, implementation programs for NPS pollution control shall include the following five key elements: (1) address NPS pollution in a manner that achieves and maintains water quality objectives and beneficial uses, including any applicable antidegradation requirements; (2) have a high likelihood that the program will attain water quality requirements, including consideration of the management practices to be used and the process for ensuring their proper implementation; (3) include a specific time schedule, and corresponding quantifiable milestones designed to measure progress toward reaching the specified requirements; (4) include sufficient feedback mechanisms to determine if the program is achieving its stated purpose; and (5) make clear, in advance, the potential consequences for failure to achieve the program's stated purposes.

The NPS Policy recognizes that the "challenges to implementing statewide prevention and control of NPS pollution discharges are significant." "Current land use management practices that have resulted in NPS pollution have a long and complicated physical, economic and political history. . . . Therefore, it is expected that it will take a

5

significant amount of time for the [regional boards] to approve or endorse NPS control implementation programs throughout their regions, and even longer for those programs to achieve their objectives." "Most NPS management programs typically depend, at least in part, upon discharger implementation of management practices (MPs) to control nonpoint sources of pollution."

*The Antidegradation Policy*

The second relevant water policy is Resolution No. 68-16, Statement of Policy with Respect to Maintaining High Quality of Waters in California. This policy is known as the antidegradation policy. (*Asociacion de Gente Unida por el Agua v. Central Valley Regional Water Quality Control Bd.* (2012) 210 Cal.App.4th 1255, 1259, fn. 2 (*AGUA*).) It sets forth the policy of the state to regulate the granting of permits and licenses for the disposal of wastes into the waters of the state to achieve the "highest water quality consistent with maximum benefit to the people of the State" and where the quality of water is higher than that established by adopted policies, the higher quality must be maintained "to the maximum extent possible consistent with the declaration of the Legislature."

In *AGUA, supra,* 210 Cal.App.4th 1255, this court explained the process for an antidegradation analysis. "[T]he Regional Board must compare the baseline water quality (the best quality that has existed since 1968) to the water quality objectives. If the baseline water quality is equal to or less than the objectives, the objectives set forth the water quality that must be maintained or achieved. In that case the antidegradation policy is not triggered. However, if the baseline water quality is better than the water quality objectives, the baseline water quality must be maintained in the absence of findings required by the antidegradation policy." (*Id*. at p. 1270.)

*Discharge Requirements and Waivers*

Anyone discharging waste that could affect the quality of waters in California must file a discharge report. (§ 13260, subd. (a).) The regional boards regulate such

6

waste discharges by prescribing requirements. (§ 13263.) Such discharge requirements "may specify certain conditions or areas where the discharge of waste, or certain types of waste, will not be permitted." (§ 13243.)

The discharge requirements may be waived "if the state board or a regional board determines . . . that the waiver is consistent with any applicable state or regional water quality control plan and is in the public interest." (§ 13269, subd. (a)(1).) A waiver may not exceed five years, may be renewed, and may be terminated at any time by the State Board or the regional board. (*Id*., subd. (b)(1).) "The conditions of the waiver shall include, but need not be limited to, the performance of individual, group, or watershed-based monitoring . . . . Monitoring requirements shall be designed to support the development and implementation of the waiver program, including, but not limited to, verifying the adequacy and effectiveness of the waiver's conditions." (*Id*., subd. (a)(2).)

Neither a waste discharge requirement nor a waiver thereof is permitted to specify a particular *manner* of compliance with the discharge standard, with two exceptions not pertinent here. (§ 13360, subd. (a).) "Section 13360 is a shield against unwarranted interference with the ingenuity of the party subject to a waste discharge requirement; it is not a sword precluding regulation of discharges of pollutants. It preserves the freedom of persons who are subject to a discharge standard to elect between available strategies to comply with that standard." (*Tahoe-Sierra Preservation Council v. State Water Resources Control Bd*. (1989) 210 Cal.App.3d 1421, 1438.)

In its challenge to the modified waiver, Coastkeeper contended and the trial court found, for the most part, that the modified waiver did not comply with section 13269 because it was not consistent with the Central Coast basin plan, including the NPS Policy and antidegradation policy, and was not in the public interest.

7

**FACTUAL AND PROCEDURAL BACKGROUND**

*The 2004 Waiver*

In July 2004 the Regional Board adopted a conditional waiver pursuant to section 13269 (the 2004 waiver) "to regulate discharges from irrigated lands to ensure that such discharges are not causing or contributing to exceedances of any Regional, State, or Federal numeric or narrative water quality standard." At that time, the Central Coast Region had 600,000 acres of farmland and over 2,500 operations that could potentially discharge waste in the state's waters. Under the 2004 waiver, "Agricultural dischargers enrolled and established farm plans based on education and outreach, and created an industry-led, nonprofit, monitoring program."

*The Regional Board's Draft Waivers and Comments*

Beginning in late 2008, the Regional Board staff began working on a subsequent waiver. In July 2009 the 2004 waiver was renewed for one year. In 2010 the Regional Board staff declared a need to change the 2004 waiver because it lacked clarity and did not focus on accountability and verification of directly resolving the known water quality problems. "The conditions of the 2004 Conditional Waiver address all common problems associated with all agricultural operations equally and without specific targets or timelines for compliance." Staff found no evidence that the 2004 waiver improved water quality.

Over the next few years, the Regional Board held a series of meetings and workshops with various stakeholders, including environmental interest groups and agricultural interest groups. Staff produced the first preliminary draft waiver in February 2010. We refer to this document as the 2010 preliminary draft. The 2010 preliminary draft directly addressed "agricultural discharges – especially contaminated irrigation runoff and percolation to groundwater causing widespread toxicity, unsafe levels of nitrate, unsafe levels of pesticides, and excessive sediment in surface waters and/or groundwaters. The [draft] also focuse[d] on those areas of the Central Coast Region

8

already known to have, or [be] at great risk for, severe water quality impairment. In addition, the [draft] require[d] the effective implementation of management practices (related to irrigation, nutrient, pesticide and sediment management) that will most likely yield the greatest amount of water quality protection. The [draft] include[d] immediate requirements to eliminate or minimize the most severe or impactful agricultural discharges and additional requirements with specific and reasonable time schedules to eliminate or minimize degradation from all agricultural discharges. The [draft] also includes clear and direct methods and indicators for verifying compliance and monitoring progress over time."

The 2010 preliminary draft required enhanced monitoring, including individual monitoring. It prohibited certain discharges, including prohibiting "excessive use or over-application of fertilizer in excess of crop needs." It required annual updated farm plans and provided a schedule (two to four years) for implementing management measures, and prohibited certain pesticide usage.

Numerous agricultural interests commented on the 2010 preliminary draft; in general, they were disappointed in its direction away from a collaborative approach to a regulatory approach that some found heavy handed. Many expressed concern about the economic impact of such regulation. The comments of environmental interests were in support of the 2010 preliminary draft. These interests agreed with the new emphasis on clear standards and timelines instead of training and education.

After more workshops, in late 2010 the Regional Board staff prepared a new draft waiver. The new draft retained much of the 2010 preliminary draft but introduced the idea of categorizing dischargers into three tiers based on size of farm operation, proximity to impaired watercourse, use of certain chemicals (chlorpyrifos and diazinon), and the type of crop grown. Dischargers in Tier 3 posed the highest threat to water quality and correspondingly faced the greatest amount of discharge control conditions, individual monitoring, and reporting.

9

Agricultural interests again objected to the new draft and its regulatory requirements. Environmental interests, on the other hand, were concerned that the new draft was weaker on environmental protection than the 2010 preliminary draft. A group of environmental interests, including some of those constituting Coastkeeper, objected that the new draft did not contain adequate mechanisms to address the degraded state of central coast waterways, lacked a vision for maintenance of vegetative buffers, exempted tile drains[3] from regulation, and defined Tier 3 too narrowly as dischargers could escape the requirements of Tier 3 by changing the pesticides used.

A third draft waiver was released in March 2011. This draft focused on two particular pesticides that were known sources of toxicity--chlorpyrifos and diazinon. A further draft waiver was issued in September 2011. A group of environmental interests, including Coastkeeper, "agreed to disagree" on many substantive points in the latest draft.

In a presentation in a workshop in February 2012, Coastkeeper indicated its support for the 2010 preliminary draft, with certain additions and revisions, including requiring a 30-foot vegetative buffer along Tier 2 and Tier 3 streams.

*The Regional Board's 2012 Waiver*

In March 2012 the Regional Board adopted a final order, Order No. R3-2012-0011 (the 2012 waiver). At that time the Central Coast Region had 435,000 acres of irrigated land and approximately 3,000 agricultural operations. The 2012 waiver classified dischargers into three tiers based on their risk to water quality and the level of discharge. Staff reported the 2012 waiver imposed fewer requirements on Tier 1 dischargers than the 2004 waiver, comparable requirements for Tier 2 dischargers, and greater requirements on Tier 3 dischargers. Tier 1 dischargers were required to provide online

_____

[3] Tile drains are subsurface drainage generated by installing drainage systems to lower the water table below irrigated lands.

compliance information annually. Tier 2 dischargers were required to develop a farm plan and implement management practices for irrigation, nutrients, pesticides, and erosion, with schedules for implementation. There were requirements for education, surface receiving and groundwater monitoring, backflow prevention, and annual reporting requirements for the total amount of nitrogen applied to farmlands, and riparian and wetland photographic monitoring and reporting. There were additional monitoring and reporting requirements for Tier 3 dischargers, particularly those posing the greatest risk to water quality. These requirements included nitrogen balance reporting, water quality buffer plans, irrigation and nutrient management plans, and individual surface runoff monitoring.

*Review by the State Board*

In April 2012 Coastkeeper petitioned the State Board to review the 2012 waiver pursuant to section 13320. Coastkeeper objected that the Tier 3 standard that dischargers "meet the nitrate balance ratio targets" proposed by staff in earlier drafts of the waiver had been arbitrarily revised by replacing "meet" with "make progress." Moreover, the hard "targets" in the earlier versions became soft "milestones" in the modified waiver. Coastkeeper argued, "Removing the only firm and measurable requirements for nitrate discharges renders the [2012 waiver] inconsistent with California Water Code Section 13269 because the conditional waiver is not consistent with the Basin Plan and not in the public interest."

Agricultural interests also petitioned for review, arguing the 2012 waiver was not legally adopted, was not reasonable, did not properly consider all economic, social, tangible, and intangible values involved, and imposed regulations that were unfeasible.

At the request of certain agricultural interests, the State Board stayed certain provisions of the 2012 waiver (§ 13320, subd. (e)) and reviewed it on its own motion (§ 13320, subd. (a)).

11

Coastkeeper petitioned for a writ of mandate challenging this stay and requested a preliminary injunction. A group of agricultural interests intervened, including appellants Grower-Shipper Association of Central California, Grower-Shipper Association of Santa Barbara and San Luis Obispo Counties, Western Growers Association, and California Farm Bureau Federation (interveners). Interveners united with the State Board in opposing Coastkeeper's petition and request.

The trial court denied the request for a preliminary injunction.

In comments to an earlier draft of the 2012 waiver, Coastkeeper opposed provisions relating to containment structures, nutrient management plan, and nitrogen balance ratios, and proposed additional discussion on monitoring. In further comments, Coastkeeper lamented the changes from the 2010 preliminary draft, and emphasized the need for reporting nitrogen balance ratios. Coastkeeper also objected to compliance provisions and argued broader toxicity requirements were required.

*The State Board's Modified Waiver*

At its meeting on September 24, 2013, the State Board adopted Order No. R3-2012-0011 (the 2012 waiver) as modified by Order No. WQ-2013-0101 (the modified waiver). The modified waiver recognized that nitrate pollution of drinking water was a critical problem in the region, with hundreds of drinking wells having nitrate levels in excess of state standards. It further recognized that fertilizer from irrigated agriculture was the largest source of nitrate pollution.

In a media release announcing the modified waiver, the State Board noted that an expert panel was to be convened "to assess existing agricultural nitrate control practices and propose new practices to protect groundwater as appropriate." This expert panel would "consist of a broad spectrum of experts from relevant disciplines and will hold several public workshops to take input and comment before making proposals to the [State Board]. Many of the groundwater issues contested in the petitions are best addressed by the Expert Panel, and we will task the Expert Panel with certain issues

12

related to the impact of agricultural discharges on surface water as well." The State Board would request the expert panel to consider "the indicators and methodologies for determining risk to surface and groundwater quality, the appropriate targets for measuring progress in lowering that risk, and the efficacy of groundwater and surface water discharge monitoring in evaluating practice effectiveness." [4] The State Board stressed the modified waiver "constitutes only an interim determination as to how to move forward on the difficult and complex questions presented."

The modified waiver regulated discharges of wastes from irrigated agricultural lands, commercial nurseries and greenhouses, and lands planted with commercial crops that were not yet marketable, such as vineyard and tree crops. The regulated discharges included waste discharges to surface water and groundwater.

The State Board upheld most of the 2012 waiver, but amended certain requirements. Farm plans for water quality were no longer required to provide the results of methods used to verify effectiveness and compliance, but only to describe the method and provide a schedule for assessing the effectiveness of each management practice. The nitrogen balance ratio reporting requirements for high risk Tier 3 dischargers were eliminated.

The modified waiver added provision No. 83.5 which addressed compliance with the water quality standards, the basin plan, and the time schedules for the effective control of various discharges. It provided: "Dischargers must (1) implement management practices that prevent or reduce discharges of waste that are causing or

---

[4] On November 3, 2016, this court denied the State Board's request for judicial notice of a report by the expert panel. The trial court had denied the interveners' request to take judicial notice of an unrelated declaration and attached reports. On appeal, interveners note this court may take judicial notice of this material, but do not request that we do so or provide a cogent argument why we should. Therefore, we also decline to take judicial notice of this additional material.

13

contributing to exceedances of water quality standards; and (2) to the extent practice effectiveness evaluation or reporting, monitoring data, or inspections indicate that the implemented management practices have not been effective in preventing the discharges from causing or contributing to exceedances of water quality standards, the Discharger must implement improved management practices."

The legality of provision No. 83.5 is hotly contested on appeal, as we discuss in Part IVB, *post*.

### *Proceedings in the Trial Court*

Coastkeeper filed an amended petition for a writ of mandate seeking judicial review of the modified waiver pursuant to section 13330. It alleged the modified waiver violated section 13269, subdivision (a) because it did not require dischargers to comply with water quality objectives and did not have monitoring requirements to verify the adequacy and effectiveness of the waiver's conditions. Coastkeeper further alleged the modified waiver violated the antidegradation policy by failing to provide for effective monitoring to adequately and effectively detect degradation. It contended the State Board improperly excluded relevant scientific evidence, the U.C. Davis Report, and violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) by failing to consider supplemental environmental review.

The State Board demurred to the fifth cause of action, violation of CEQA, arguing Coastkeeper had failed to exhaust its administrative remedies on this issue because it had failed to raise any CEQA issue before the State Board.

### *The Trial Court's Ruling*

Section 13330, subdivision (e), provides that Code of Civil Procedure section 1094.5 shall govern proceedings in the trial court and that the trial court shall exercise its independent judgment on the evidence. "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of

14

convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).)

In its ruling, the trial court reviewed the terms of the 2004 waiver (12AA 2814) and the 2010 preliminary draft. It compared the Regional Board's 2012 waiver to both the 2004 waiver and to the 2010 preliminary draft. It found the 2012 waiver "more demanding" than the 2004 waiver, but "less demanding" than the 2010 preliminary draft.

The court found the modified waiver was "not consistent with the Basin Plan because it lacks sufficiently specific, enforceable measures and feedback mechanisms needed to meet the Basin Plan's water quality objectives." "The problem with the Modified Waiver is that there is little to support a conclusion that the Waiver will lead to quantifiable improvements in water quality or even arrest the continued degradation of the region's waters."

The court found the modified waiver's iterative approach of requiring improved management practices until discharges no longer cause or contribute to exceedances of water quality standards was unlikely to work because the modified waiver contained no provisions that would identify the individual dischargers causing or contributing to exceedances. The court noted that "implementing management practices is not a substitute for actual compliance with water quality standards." Further, the modified waiver failed to define what constituted an "improved" management practice or to include any standards for verification of reduced pollution. The court also faulted the modified waiver for subjecting only a small number of growers (3 percent of growers and 14 percent of irrigated acreage) to the more stringent requirements of Tier 3. The vast majority of growers were not subject to individual surface monitoring to identify sources of exceedances or the effectiveness of individual farm management practices.

The court found the modified waiver did not comply with the NPS Policy (discussed *ante* in the Legal Background) "because it lacks adequate monitoring and reporting to verify compliance with requirements and measure progress over time;

15

specific time schedules designed to measure progress toward reaching quantifiable milestones; and a description of the action(s) to be taken if verification/feedback mechanisms indicate or demonstrate management practices are failing to achieve the stated objectives."

The court did not decide whether the modified waiver complied with the antidegradation policy (also discussed *ante*), but instead found it was unable to determine compliance because the State Board had failed to follow the procedure set forth in *AGUA, supra,* 210 Cal.App.4th 1255, as necessary to determine compliance with the antidegradation policy.

The court further found the modified waiver did not have adequate monitoring provisions because the cooperative surface receiving water monitoring for those in Tier 1 and Tier 2 fail to identify the source of exceedances. The court found the modified waiver was not in the public interest "because there is no evidence it will lead to quantifiable improvement in water quality or arrest the continued degradation of the Central Coast Region's waters."

The court found the State Board did not abuse its discretion in refusing to admit the U.C. Davis Report. However, it directed the State Board on remand to reconsider whether the report should be admitted.

The trial court did not rule on the demurrer to the CEQA claim. While it was not persuaded that supplemental CEQA review of the State Board's changes to the 2012 waiver (that resulted in the modified waiver) was required, the court directed the State Board on remand to consider whether supplemental review is required to comply with CEQA.

The trial court issued a peremptory writ of mandate compelling the State Board to set aside the modified waiver and reconsider the 2012 waiver, and to take sufficient action to "to formulate a new or modified waiver under Water Code § 13269 or another program that satisfies the waste discharge requirements of the Water Code." The court

16

permitted the State Board to allow the modified waiver to remain in effect while it formulated a new waiver as directed.

The State Board and interveners appealed.

## DISCUSSION

### I

### *Exhaustion of Administrative Remedies*

The State Board contends Coastkeeper failed to exhaust administrative remedies as to multiple issues by failing to raise those issues at appropriate times during the administrative process. The State Board identifies five such issues: (1) pesticide control provisions; (2) tile drain provisions; (3) the buffer provisions; (4) the tiering provisions; and (5) the individual monitoring provisions (the five specific provisions). Both the State Board and interveners contend Coastkeeper failed to exhaust administrative remedies as to the antidegradation policy claim.

Coastkeeper argues it does not contend any or all of the five specific provisions make the modified waiver unlawful. Rather, Coastkeeper claims to be challenging the modified waiver's failure to comply with the provisions of section 13269 requiring consistency with the basin plan and public interest and mandating effective verification requirements. Thus, according to Coastkeeper, the exhaustion requirement does not apply to the five specific provisions.

A. *The Exhaustion Doctrine*

"In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292.) The rule "is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts." (*Id*. at p. 293.)

"The primary purpose of the doctrine 'is to afford administrative tribunals the opportunity to decide in a final way matters within their area of expertise prior to judicial

17

review.'  [Citation.]  'The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review.'  [Citations.]  The doctrine prevents courts from interfering with the subject matter of another tribunal.  [Citation.]"  (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 874.)  Another purpose of the doctrine " 'is to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief.'  [Citation.]"  (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501.)

To advance the purpose of the exhaustion doctrine, the exact issue, not merely generalized statements, must be raised.  (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535.)  " 'The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]'  [Citation.]  An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies. [Citation.]"  (*Id.* at p. 536.)

In a petition for review by the State Board, the issues an aggrieved party may raise are limited.  "If the action or inaction that is subject of the petition was taken by the regional board after notice and opportunity to comment, the petition to the state board shall be limited to those substantive issues or objections that were raised before the regional board."  (Cal. Code Regs., tit. 23, § 2050(c).)

B.  *The Five Specific Provisions*

We begin by noting that we need not decide whether Coastkeeper properly exhausted its administrative remedies as to the provisions relating to pesticide controls, tile drains, and vegetation or riparian buffers because the trial court did not rely on any of these provisions in finding the modified waiver failed to comply with the law.  Instead, the court indicated that it was "not persuaded that an adequate Waiver necessarily must

18

include nitrogen balancing ratios, broader farm plan reporting, more rigorous pesticide controls, mandatory vegetation/riparian buffers, and/or more comprehensive tile drain monitoring." (Fn. omitted.) Thus, no issue relating to pesticide controls, tile drains, and vegetation or riparian buffers is before us because none of these subjects formed a basis for the trial court's ruling or otherwise supported it in any way.

The trial court found the "fundamental problem" with the modified waiver was that the number of growers subject to the stringent requirements of Tier 3 was too small. Dischargers are in Tier 3 if they meet one of two criteria: (1) they grow crops with a high potential to discharge nitrogen to groundwater and their total irrigated acreage is 500 acres or more; or (2) they apply chlorpyrifos and diazinon and irrigation or stormwater is discharged to a listed impaired waterbody. Coastkeeper did raise the issue, before both the Regional Board and the State Board, that dischargers can change use of the two named pesticides to others such as malathion, and thus reduce the number of growers in Tier 3. To that extent only, Coastkeeper exhausted administrative remedies as to the challenge to Tier 3.

The trial court found the modified waiver had inadequate monitoring provisions. That finding was based in part on the limitations (e.g., inability to identify specific dischargers) of representative monitoring as opposed to individual monitoring. Coastkeeper did raise the need for individual monitoring before both the Regional Board and the State Board. Indeed, the State Board conceded the issue of cooperative groundwater monitoring was properly raised. Thus, the issue of the inadequacy of representative or cooperative monitoring was properly exhausted.

C. *The Antidegradation Policy*

The first time the issue of noncompliance with the antidegradation policy was raised was a July 3013 comment to a draft of the modified waiver by a group of environmental interests that did not include Coastkeeper. That comment specifically objected that the antidegradation analysis had not been conducted in accordance with the

19

recent case, *AGUA, supra,* 210 Cal.App.4th 1255. Although *AGUA* was not yet decided when the waiver was before the Regional Board or when Coastkeeper filed its petition for review with the State Board, the State Board found that compliance with the antidegradation policy in general had not been raised during the relevant processes. For this reason, the State Board found failure to exhaust administrative remedies as to that policy.[5] (See Cal. Code Regs., tit. 23, § 2050(c) [where challenged action or inaction taken by the regional board, the petition to the state board shall be limited to those substantive issues or objections that were raised before the regional board].)

Coastkeeper argues administrative remedies were exhausted because the Regional Board was apprised of the need to satisfy the antidegradation policy. Several comments urged the board to act to prevent further degradation. Coastkeeper notes the Regional Board made findings that the policy had been satisfied. While it is clear the Regional Board was aware of the policy and the need to comply with it, there was no specific objection that it had failed to do so. Coastkeeper has not pointed to any comment before the Regional Board that mentioned the policy. Thus, administrative remedies were not exhausted as to the objection of noncompliance with the antidegradation policy.

II

*Standard of Review of Adequacy of Modified Waiver*

Where, "as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test. [Citations.]" (*Fukuda, supra,* 20 Cal.4th at p. 824.) "[W]e review its factual determinations under the

---

[5] The State Board noted it had undertaken a review of the antidegradation policy in light of *AGUA* and understood "the need to provide better tools for regional boards to conduct an appropriate analysis." "These resources will be available to the Central Coast Water Board as it develops its next iteration of the [modified waiver]."

substantial evidence standard and its legal determinations under the de novo standard. [Citations.] '[W]e are not bound by the legal determinations made by the state or regional agencies or by the trial court. [Citation.] But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute.' [Citation.]" (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Board* (2017) 12 Cal.App.5th 178, 190.)

Accordingly, we review the factual findings of the trial court for substantial evidence. The ultimate question of whether the modified waiver complies with the law is a question of law we review de novo. (*AGUA, supra,* 210 Cal.App.4th at p. 1268 [de novo review of whether regional board order complied with law].)

III

*Compliance with Basin Plan*

A. *The Trial Court's Findings*

The trial court found "the Modified Waiver is not consistent with the Basin Plan because it lacks sufficiently specific, enforceable measures and feedback mechanisms needed to meet the Basin Plan's water quality objectives." The court found "little to support a conclusion that the [Modified] Waiver will lead to quantifiable improvements in water quality or even arrest the continued degradation of the region's waters."

After setting out at length the parties' contentions, the trial court found three areas in which the modified waiver was inadequate: (1) it continued the failed approach of the 2004 waiver which had failed to improve the region's water quality or even halt its continued degradation; (2) its coverage was inadequate because it included too few growers (about 3 percent of growers and 14 percent of irrigated acreage) in Tier 3 and subjected the vast majority of growers to the same or less stringent requirements than the 2004 waiver; and (3) its monitoring requirements were inadequate because the cooperative monitoring would not identify the individual dischargers who were causing

21

or contributing to the pollution problem and there were no standards or benchmarks for showing improvement.

Significantly, the court did not find that an adequate waiver must include "nitrogen balancing ratios, broader farm plan reporting, more rigorous pesticide controls, mandatory vegetation/riparian buffers, and/or more comprehensive tile drain monitoring."[6] (Fn. omitted.)

B. *Contentions of Error*

The State Board and interveners contend, in general, that the trial court made three significant errors in approaching this case. First, they contend the court erroneously compared the modified waiver to the 2010 preliminary draft. They argue the draft, which was never adopted by the Regional Board, had no legal significance and should not be used as evidence. The State Board adds that the court erred in using the 2010 preliminary draft as the baseline for adequate standards.

Second, appellants and interveners contend the trial court failed to defer to the State Board's technical expertise and failed to apply a presumption of correctness to its findings. In particular, appellants contend the court failed to recognize and defer to the State Board's plan to refer many of the difficult, technical questions to an expert panel. They correctly note that deference is required.

Administrative findings come before the court with "a strong presumption of correctness." (*Fukuda, supra,* 20 Cal.4th at p. 817.) "An administrative agency's construction of the authority vested in the agency to carry out a statutory provision is entitled to great weight and will be followed unless it is clearly erroneous or unauthorized." (*Western States Petroleum Ass'n v. Department of Health Services* (2002) 99 Cal.App.4th 999, 1006.) "Greater deference should be given to an agency's

---

[6] Rather than focus their briefing on the trial court's actual ruling, appellant and interveners devote extensive (and needless) briefing on these uncontested issues.

interpretation where ' "the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion." ' " (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032, 1041.)

Third, appellant and interveners argue the trial court ignored the reasonableness standard of the Porter-Cologne Act and the need to balance competing interests. The goal of water quality regulation is "to attain the highest water quality which is *reasonable*, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (§ 13000, italics added.) Water quality objectives are established for "the *reasonable* protection of beneficial uses of water or the prevention of nuisance within a specific area." (§ 13050, subd. (h), italics added.)

With these claims and considerations in mind, we turn to the question of whether substantial evidence supports the trial court's findings. While the court primarily criticized the *approach* of the modified waiver, we focus on whether the *conditions* in the modified waiver are consistent with the basin plan. (§ 13269, subd. (a).)

1. *Coverage*

The trial court found the low number of growers in Tier 3 was a "fundamental problem" with the modified waiver. In addition, the court noted Tier 3 growers could move to a lower tier by participating in approved program or project or, in some cases, using pesticides other than diazinon or chlorpyrifos.

The modified waiver categorizes dischargers into three tiers. These tiering categories are the same as those originally contained in the 2012 Waiver. A discharger falls in Tier 3 if the individual farm or ranch meets one of the two following criteria: (1) grows crop types with a high potential to discharge nitrogen to the groundwater at the farm/ranch, and the total irrigated acreage of the farm/ranch is greater than or equal to

23

500 acres; or (2) applies chlorpyrifos or diazinon at the farm/ranch, and the farm/ranch discharges irrigation or stormwater runoff to a waterbody listed as impaired due to toxicity or pesticides.

As discussed *ante* in Part IB, Coastkeeper objected very narrowly to only one aspect of the tiering system; its objection was only to the ability of a Tier 3 grower to move to a lower tier by using different pesticides. In other words, Coastkeeper objected that the modified waiver's focus, evident in the tiering structure, was limited to two pesticides--chlorpyrifos and diazinon.

The Regional Board decided to include only these two pesticides as part of the tiering structure because they were the major causes of severe toxicity in agricultural areas. It had considered using the list of high risk or restricted use pesticides developed by the Department of Pesticide Regulation, but had determined that many of these pesticides were not in broad use in the region and had not been documented to cause toxicity or pesticide specific problems. The Regional Board also considered including, in the tiering, the more than 75 pesticides in use, but concluded the result would have been a very complicated process. It explained its final decision: "To focus on priority water quality issues and provide for a less complicated tiering process, staff chose to include only those pesticides that are currently documented as a primary cause of toxicity in the Central Coast region – chlorpyrifos and diazinon."

In comments to a draft of the modified waiver, Coastkeeper claimed, "New information indicates that growers are switching away from Diazinon and chlorpyrifos and towards malathion, which will result in many fewer growers being enrolled in the most stringent regulatory tier, Tier 3." This "new information," however, is not included in the record (or at least Coastkeeper has not identified it on appeal). Given the lack of evidence to refute the reasonable determination to focus regulation on the main pesticides known to be in use and causing the water quality problems, the trial court's finding as to the inadequacy of the tiering structure is not supported by substantial evidence.

24

## 2. *Adequacy of Monitoring Requirements*

Section 13269, subdivision (b) provides a waiver shall include monitoring requirements. "Monitoring requirements shall be designed to support the development and implementation of the waiver program, including, but not limited to, verifying the adequacy and effectiveness of the waiver's conditions." (*Id*., subd. (a)(2).) The issue here is whether the monitoring provisions of the modified waiver are adequate.

### a. Monitoring Provisions in the Modified Waiver

The modified waiver includes three monitoring and reporting programs, one for each tier. For Tier 1, surface receiving water quality must be monitored, either individually or cooperatively; cooperative monitoring is encouraged. Dischargers must develop a plan describing how the monitoring will achieve objectives, providing for certain analyses by a certified laboratory, and including a schedule for sampling. Dischargers must file an annual report that includes a summary of reported exceedances, a discussion of data illustrating compliance with water quality standards, and the evaluation of pesticide and toxicity analyses. Groundwater monitoring requires sampling of wells for private domestic drinking water and agricultural groundwater. Again, this monitoring may be cooperative. The focus of the groundwater monitoring is on drinking water and the presence of nitrates.[7]

The monitoring program for Tier 2 contains the same requirements as that for Tier 1 and adds a calculation of nitrate-loading risk factors, reporting of the total nitrogen applied and an annual compliance form, and photo monitoring. The annual compliance

---

[7] The trial court criticized the monitoring program for emphasizing the quality of drinking water over the effectiveness of implemented management practices. Coastkeeper's brief, however, stresses the problem of polluted drinking water. We do not fault the State Board and Regional Board for focusing on the most immediate problem. (See *U.S. Cellular Corp. v. F.C.C.* (D.C. Cir. 2001) 254 F.3d 78, 87 [Regulatory "agencies need not address all problems 'in one fell swoop' "], cited in *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 421.)

form required verifications of compliance, identification of discharges and management practices, disclosure of nitrogen concentrations and application of fertilizers, and proof of backflow prevention. There were additional requirements for dischargers with a high nitrate-loading risk or who were adjacent to an impaired waterbody.

The monitoring program for Tier 3 added individual surface discharge monitoring and reporting, an irrigation and nutrient plan for dischargers with a high nitrate-loading risk, and a water quality buffer plan for those adjacent to impaired waterbodies.

The trial court rejected some of Coastkeeper's claims of deficiency, such as the failure to require all dischargers to perform individual monitoring, the frequency of sampling, statistical monitoring, and the disclosure of monitoring information to the public. Nonetheless, the court found the monitoring requirements were inadequate because (1) they failed to provide for the identification of the individual discharger responsible for exceedances, and (2) they failed to verify compliance and assess the effectiveness of management practices.

### b. Failure to Identify Specific Discharger

As the trial court recognized, both the section 13269 and the NPS Policy ("third-party programs") expressly allow the use of group or watershed monitoring. Individual monitoring would be costly and could overwhelm the Regional Board with paperwork from over 3,000 dischargers. The court concluded, therefore, that the State Board acted within its discretion in limiting individual surface discharge monitoring to high risk dischargers. The court also found, however, that group monitoring failed to identify the particular source of an exceedance. It noted that the State Board acknowledged this limitation and suggested a possible solution, but failed to include any changes to address the problem. For this reason, the court concluded the modified waiver was inadequate.

The State Board expressed skepticism that the Regional Board had selected a monitoring program "best suited to meet the purpose of identifying and following up on high-risk discharges." It suggested the monitoring program adopted by the Central

26

Valley Regional Water Quality Control Board may be more appropriate. That program provided that a detected exceedance may trigger source identification, management practice implementation, and follow up reporting. The State Board then decided to "ask the Expert Panel to consider both the receiving water and discharge monitoring approaches to identification of problem discharges." It found that in the interim, focusing the monitoring program on the high-risk dischargers was appropriate.

The trial court, however, failed to consider the State Board's referral of the issue to the expert panel for long-term solutions. This referral reflects the State Board's view that modified waiver "constitutes only an interim determination as to how to move forward on the difficult and complex questions presented." The only alternative solution offered by Coastkeeper was mandatory individual monitoring for all dischargers. The court upheld the State Board's finding that mandatory individual monitoring was too costly, too burdensome, and would overwhelm the Regional Board.

Without any evidence of a viable alternative, the trial court's finding that the State Board did nothing to address the identification of the source of exceedances is not supported by substantial evidence.

c. Verification

Monitoring requirements must be designed to verify "the adequacy and effectiveness of the waiver's conditions." (§ 13269, subd. (a)(2).) The trial court found the monitoring requirements would show whether the implemented management practices were reducing pollution. The court found, however, that the modified waiver did not "set any benchmarks for defining how much 'improvement' a grower must show to demonstrate compliance" and thus was inadequate.

It appears these problems that the trial court perceived in the modified waiver do not signal a failure to meet section 13269's requirement to verify "the adequacy and effectiveness of the waiver's conditions." The court found the monitoring *met* this requirement by determining and reflecting whether current management practices

27

reduced pollution. Rather, the question posed by the absence of benchmarks or a definition of "improvement" is whether the monitoring provisions fail to meet the requirements of the NPS Policy. That policy mandates that an NPS program have a high likelihood of attaining water quality standards, with specific time schedules and quantifiable milestones to measure progress. We next discuss whether the modified waiver complies with that policy.

IV

*Compliance with NPS Policy*

As set forth *ante* in the Legal Background, to comply with the NPS Policy, five key elements must be present: (1) address NPS pollution in a manner that achieves and maintains water quality objectives and beneficial uses, including any applicable antidegradation requirements; (2) have a high likelihood that the program will attain water quality requirements, including consideration of the management practices to be used and the process for ensuring their proper implementation; (3) include a specific time schedule, and corresponding quantifiable milestones designed to measure progress toward reaching the specified requirements; (4) include sufficient feedback mechanisms to determine if the program is achieving its stated purpose; and (5) make clear, in advance, the potential consequences for failure to achieve the program's stated purposes.

A. *Time Schedules and Milestones*

The trial court found the modified waiver did not meet the requirements of the NPS Policy because it lacked (1) adequate monitoring and reporting to verify compliance; (2) specific time schedules and quantifiable milestones; and (3) a description of enforcement actions if management actions fail to achieve objectives. The court found the State Board had failed to show a high likelihood that the modified waiver would be successful in attaining the applicable water quality standards.

The State Board stresses that the NPS Policy envisions an iterative approach, with ongoing adjustments and improvements to control NPS pollution. This less structured

28

approach is necessary given the "significant" challenges of preventing and controlling NPS pollution. Interveners argue instantaneous compliance with water quality objectives is not required. They fault the trial court for expecting "a step-by-step time schedule with specific dates, and a monitoring and reporting program designed to determine compliance with said time schedule." Interveners further argue the modified waiver does indeed include time schedules and milestones.

We agree that the modified waiver does contain a number of time schedules and milestones set forth in tables two, three, and four thereto. Most of the time schedules relate to dates by which certain reports must be submitted. Some address specific actions, such as installing backflow prevention devices and destroying abandoned groundwater wells. There are specific milestones for Tier 3 dischargers relating to percentage reduction in turbidity or sediment load, nutrients, and nitrogen.

Four provisions in the modified waiver set time schedules for Tier 3 dischargers to effectively control waste discharges of pesticides and toxic substances, sediment and turbidity, nutrients, and nitrates.

B. *Provision No. 83.5*

Compliance with these four Tier 3 time schedules, as well as compliance with the requirements not to cause or contribute to exceedances and to comply with the basin plan, is governed by provision No. 83.5. That provision requires dischargers to implement management practices to reduce or prevent discharges that cause or contribute to exceedances of water quality standards. If those practices are ineffective, the discharger must implement improved management practices.

Provision No. 83.5 is the crux of this dispute. It effectively overrides the specific time schedules by defining compliance to mean the implementation of increasingly improved management practices and it does so without any definition or quantification of improvement. The State Board added this provision as part of its review and modification of the 2012 Waiver. The State Board explained this provision was added to

29

clarify that it would not take any enforcement action against a discharger who was implementing and improving management practices to address water quality problems. Dischargers need only make "a conscientious effort to identify and implement the management practices that effectively address the water quality issue." The State Board noted this approach was consistent with the NPS Policy and public interest in addressing a complex water quality issue that has few (if any) immediate and easy solutions.

Interveners contend the definition of an improved management practice is provided by the NPS Policy's citation to *Northwest Indian Cemetery Protective Ass'n. v. Peterson* (9th Cir. 1985) 764 F.2d 581, rev. on another ground in *Lyng v. Northwest Indian Cemetery Protective Ass'n*. (1988) 485 U.S. 439. In *Northwest Indian*, the State of California and various non-profit organizations challenged federal plans to permit timber harvesting and construct a road in a national forest. One point of contention was that implementation of the federal plans would not meet the water quality requirements for turbidity set by the regional board. The federal government argued those requirements had been replaced by the acceptance of Forest Service Best Management Practices (BMPs). The Ninth Circuit rejected this argument, finding that BMPs are not standards in and of themselves and adherence to BMPs does not assure compliance. The court made the point that a BMP can be terminated or modified if a stricter BMP is required, such as to meet state water quality standards. (*Id*. at pp. 588-589.)

We read *Northwest Indian* to distinguish between adherence to a BMP and compliance with the applicable water quality standard. The NPS Policy makes the same distinction. Management practice "implementation never may be a substitute for meeting water quality requirements." *Northwest Indian* notes that compliance with the water quality standard may require a stricter (or improved) management practice. That is also what provision No. 83.5 says. Neither *Northwest Indian* nor provision No. 83.5 provides any guidance as to how much improvement is required once a certain management practice is determined to be ineffective in meeting the water quality standard.

30

As we have explained, the NPS Policy *expressly* requires time schedules and quantifiable milestones; the purpose is to assure that the water quality objectives are eventually met. But there is no requirement that the ultimate goal of preventing and cleaning up NPS pollution be accomplished within the lifespan of the modified waiver. Although the State Board has discretion to determine how much time is reasonable as well as appropriate milestones and how quickly they must be met, the modified waiver does not reflect any such determinations. Rather than establishing time schedules and milestones, it requires only vague and indefinite improvement--"a conscientious effort." Without specific time schedules and quantifiable milestones, there is not a "high likelihood" the program will succeed in achieving its objectives, as required by NPS Policy.

In *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, this court found the State Board failed to implement certain salinity objectives of the 1995 Bay-Delta Plan at three locations. The State Board delayed implementation at these three locations by several years. We found this delay was not an adequate implementation because nothing in the 1995 Bay-Delta Plan allowed for such delay. The State Board was in effect amending the 1995 Bay-Delta Plan without complying with the procedural requirements for an amendment. (*Id*. at p. 735.)

Here, the State Board is rewriting--or amending--the NPS Policy by replacing the required element of specific time schedules and quantifiable milestones with a vague requirement of "improved" management practices and a "conscientious effort." As in *State Water Resources Control Bd. Cases,* rewriting the NPS Policy to delay, diminish, or dilute a requirement that is part of the policy is improper. While we defer to an administrative agency's interpretation of a statute, regulation, or policy involving its area of expertise, we owe no deference to an interpretation that "flies in the face of the clear language and purpose of the interpreted provision." (*Communities for a Better Environment v. State Water Resources Control Bd*. (2003) 109 Cal.App.4th 1089, 1104.)

31

The trial court did not err in finding the modified waiver did not comply with the NPS Policy due to the absence of "specific time schedules designed to measure progress toward reaching quantifiable milestones."

Because the modified waiver does not comply with the NPS Policy, it does not meet the requirements for a waiver under section 13269, subdivision (a). We need not separately determine whether the modified waiver is "in the public interest" because it fails to meet the legal requirements in any event.

V

*Other Contentions*

A. *Failure to Consider U.C. Davis Report*

The fourth cause of action in Coastkeeper's petition for writ of mandate alleged the State Board improperly excluded relevant scientific evidence, the U.C. Davis Report. The trial court was "not persuaded that the [State] Board abused its discretion in refusing to admit the U.C. Davis report. However, on remand the [State] Board is directed to reconsider whether the Report should be admitted into the record."

The State Board contends it was inappropriate to direct reconsideration of the decision not to admit the report and the court's ruling is inconsistent with the finding of no abuse of discretion. "The trial court's Ruling[] seems to reflect an approach that since the court remanded the Modified Waiver back to the State Board, then everything else that Coastkeeper wanted should also be reconsidered on remand."

We reject this view of the trial court's ruling. We note that the modified waiver was originally scheduled to expire in 2017. Thus, a replacement may well be on the horizon. Consequently, it is appropriate that the Regional and State Boards be open to considering new material, such as the report of the expert panel and any new reports from other experts. We find no error in this aspect of the ruling.

32

B.  *CEQA Review*

Coastkeeper alleged the State Board had violated CEQA by failing to undertake any environmental review of the modifications to the 2012 waiver.  The State Board demurred to this cause of action on the basis that Coastkeeper had failed to exhaust administrative remedies on this issue.  The trial court did not specifically rule on the demurrer, but did find it possible "some additional environmental review was required." The court directed the State Board on remand to consider what supplemental environmental review was required to comply with CEQA.  The State Board contends the trial court erred in failing to rule on its demurrer and argues strenuously no further CEQA review was required.  It further objects that the court is opening remand to a reconsideration of "everything else Coastkeeper wanted."

When changes are made to a project, such as the State Board's modifications to the 2012 waiver, the agency making the modifications must determine whether the initial environmental document remains sufficient or whether revisions to that document or supplemental review is required.  (*Friends of the College of San Mateo Gardens v. San Mateo County Community College District* (2016) 1 Cal.5th 937, 952-953.)  The trial court merely directed compliance with this requirement, and did not err in so doing.

## DISPOSITION

The judgment is modified to provide that a writ of mandate shall issue commanding the State Board to commence further proceedings as appropriate to formulate a new or modified waiver under Water Code section 13269 or another program that satisfies the waste discharge requirements of the Water Code and applicable state water policies, consistent with this opinion. The parties shall bear their own costs of appeal. (Cal. Rules of Court, rule 8.278(a).)

_____/s/_____
Duarte, J.

We concur:


_____/s/_____
Robie, Acting P.J.


_____/s/_____
Murray, J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MONTEREY COASTKEEPER et al., | C080530 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2012-80001324-CU-WM-GDS) |
| v. | |
| STATE WATER RESOURCES CONTROL BOARD, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant; | [NO CHANGE IN JUDGMENT] |
| GROWER-SHIPPER ASSOCIATION OF CALIFORNIA et al., | |
| Interveners and Appellants. | |

THE COURT:

The opinion in the above-entitled matter filed September 18, 2018, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:


_____/s/_____
Robie, Acting P. J.


_____/s/_____
Murray, J.


_____/s/_____
Duarte, J.

# EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge.  Affirmed as modified with directions.

Somach Simmons & Dunn, Theresa A. Dunham and Theresa C. Barfield for Intervenors and Appellants Grower-Shipper Association of Central California; Grower-Shipper Association of Santa Barbara and San Luis Obispo Counties, and Western Growers Association.

California Farm Bureau Federation, Nancy N. McDonough and Kari E. Fisher for Intervenor and Appellant California Farm Bureau Federation.

Xavier Becerra, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Tracy L. Winsor, Supervising Deputy Attorney General, Matthew J. Goldman and Emel G. Wadhwani, Deputies Attorney General for Defendant and Appellant State Water Resources Control Board.

Environmental Law Clinic, Deborah A. Sivas, Alicia E. Thesing, John Ugai, Duncan Pickard; Environmental Law and Justice Clinic, Helen H. Kang, Tovah Trimming, Collin McCarthy, and M. Tyler Sullivan for Plaintiffs and Respondents Monterey Coastkeeper, a program of The Otter Project, a non-profit organization, San Luis Obispo Coastkeeper, California Sportfishing Protection Alliance, and Santa Barbara Channelkeeper.